# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| JEFFREY W. REICHERT, | ) |
| 3812 Bruce Road | ) |
| Chesapeake, VA 23321 | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CONCORDIA PREPARATORY SCHOOL, | ) |
| 1145 Concordia Drive | ) |
| Towson, MD 21286 | ) |
| | ) |
|    Serve: Andrew Croll | ) |
|     306 W. Chesapeake Ave. | ) |
|     Towson, MD 21204 | ) |
| | ) |
| and | ) |
| | ) |
| STEPHEN BERGER, | ) |

FILED — ENTERED
LOGGED — RECEIVED

DEC 1 6 2025

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

Civil Action No. ABA 2 5 CV 4 1 4 5

1

**in his individual and official capacities**   )

**c/o Concordia Preparatory School**   )

**1145 Concordia Drive**   )

**Towson, MD 21286**   )

   )

**and**   )

   )

**BRENT JOHNSON,**   )

**in his individual and official capacities**   )

**c/o Concordia Preparatory School**   )

**1145 Concordia Drive**   )

**Towson, MD 21286**   )

   )

**and**   )

   )

**JOHN DOE, Athletic Director,**   )

**in his individual and official capacities**   )

**c/o Concordia Preparatory School**   )

**1145 Concordia Drive**   )

**Towson, MD 21286**   )

   )

**and**   )

   )

2

| | |
|---|---|
| **JOHN DOE 1–2, Football Coaches,** | ) |
| **in their individual and official capacities** | ) |
| **c/o Concordia Preparatory School** | ) |
| **1145 Concordia Drive** | ) |
| **Towson, MD 21286** | ) |
| | ) |
| **and** | ) |
| | ) |
| **REV. PETER COUSER, Campus Pastor,** | ) |
| **in his individual and official capacities** | ) |
| **c/o Concordia Preparatory School** | ) |
| **1145 Concordia Drive** | ) |
| **Towson, MD 21286** | ) |
| | ) |
| **Defendants.** | ) |

## COMPLAINT AND REQUEST FOR EMERGENCY INJUNCTIVE RELIEF

### INTRODUCTION

1.      This case involves an extraordinary and unlawful campaign by Concordia Preparatory School ("CPS") and key members of its leadership — most notably its Director of Admissions and Head Varsity Lacrosse Coach, **Stephen Berger** — to interfere with Plaintiff Jeffrey Reichert's fundamental parental rights, to conceal material information regarding his minor son

3

Grant, and to isolate Grant from his father through deception, misuse of legal documents, physical obstruction, and violations of Maryland law.

2.      Rather than operate as an educational institution bound by law, ethics, and child-safety responsibilities, CPS — through Berger and others — acted as an extension of a custody-abusing parent, inserting itself into an ongoing family matter and taking affirmative steps to conceal Grant's enrollment, suppress communication, enforce an invalid Temporary Protective Order ("TPO"), obstruct a child protective services investigation, and restrict a father's contact with his son for more than a year.

3.      Defendant Stephen Berger is uniquely positioned at the center of this misconduct. As CPS's **Director of Admissions** and **Head Boys' Varsity Lacrosse Coach**, Berger controlled both (1) Grant's enrollment and educational access; and (2) Grant's athletic participation and daily supervision. According to CPS's own leadership webpage, Berger holds both positions simultaneously — granting him extraordinary access, influence, and authority over Grant's school life.

4.      Plaintiff alleges Berger abused this dual authority intentionally, maliciously, and in coordination with Grant's mother, **Sarah Hornbeck**, with whom Berger attended Washington College and, upon information and belief, maintained a friendly personal relationship. Instead of fulfilling his professional duty to remain neutral and comply with custody law, Berger acted as an ally to Sarah, facilitating a scheme to keep Grant hidden from Plaintiff, to prevent Plaintiff from exercising lawful custody rights, and to manipulate school staff into treating Plaintiff as a danger despite having no legal basis to do so.

4

5.      The misconduct escalated dramatically on October 9, 2024, when Berger obtained a copy

of an unserved and legally meaningless TPO filed by Sarah and brought it to football practice.

Despite knowing the TPO had never been served — and thus had **no force or effect** — Berger

directed CPS athletic personnel to enforce it as if it were binding law. Under Berger's

instructions, CPS coaches removed Grant from practice and told him, "You can't speak to your

dad anymore," causing immediate psychological trauma.

6.      Over the following months, CPS repeatedly refused to allow Plaintiff to communicate

with his son, even when (a) **Grant himself requested** to speak with Plaintiff from the office of

CPS pastor Rev. Peter Couser; and (b) a court-authorized supervisor offered to facilitate a

monitored call. CPS also refused to provide enrollment records, academic records, counseling

information, communications, or internal correspondence — materials which Maryland law and

the Custody Order expressly entitle Plaintiff to receive.

7.      The misconduct did not end there. On August 29, 2025, two CPS football coaches

physically restrained Grant to prevent him from approaching Plaintiff after a game. "They said I

can't talk to you," Grant told his father afterward. This physical interference was unlawful,

unnecessary, and dangerous — and it further demonstrates CPS's institutional adoption of

Berger's improper directives.

8.      At every turn, when Plaintiff confronted CPS with contradictions, misrepresentations,

and unlawful actions, the school shifted explanations, altered timelines, and made false

statements. CPS Headmaster Brent Johnson told Plaintiff that "Berger handled the enrollment; I

had nothing to do with it." But CPS's attorney later wrote that Berger "had nothing to do with

Grant's enrollment or education," a statement flatly contradicted by the evidence — particularly Berger's weekly team parents lacrosse communications about Grant to Plaintiff.

9.      CPS also failed to report suspected emotional abuse of Grant to Maryland Child Protective Services as required by **Maryland Family Law § 5-704**. Worse, CPS actively obstructed the state investigation that was initiated after Plaintiff's mother — herself a mandatory reporter — filed a report based on direct statements from Grant.

10.     This lawsuit seeks redress for a pattern of intentional wrongdoing, institutional dishonesty, and reckless disregard for a child's wellbeing. Plaintiff requests compensatory damages, punitive damages, declaratory relief, and **emergency injunctive relief** requiring CPS to cease interference with Plaintiff's lawful parental rights, to correct misleading records, and to allow Plaintiff to resume communication with his son without fear of further retaliation, deception, or coercion.

## II. JURISDICTION, VENUE, AND PARTIES

### A. Jurisdiction

11.     This Court has subject matter jurisdiction under **28 U.S.C. § 1331** because this action implicates federal constitutional rights, including Plaintiff's fundamental liberty interest in the care, custody, and control of his child under the Fourteenth Amendment. These rights are actionable under federal law and provide an independent federal-question basis for jurisdiction. Plaintiff seeks equitable relief to vindicate federal constitutional rights against private actors whose conduct constitutes state-action substitutes and interference with federally protected liberty interests.

12.     This Court also has jurisdiction under **28 U.S.C. § 1367(a)** because Plaintiff's state-law claims—including tortious interference with custodial rights, negligence, negligent supervision, negligent hiring and retention, fraudulent concealment, intentional infliction of emotional distress, false imprisonment, and civil conspiracy—derive from a common nucleus of operative fact and form part of the same case or controversy as the federal claims.


### B. Diversity Jurisdiction Under 28 U.S.C. § 1332(a)

13.     This Court has **original jurisdiction** under **28 U.S.C. § 1332(a)** because there is **complete diversity of citizenship** and the **amount in controversy exceeds $75,000**, exclusive of interest and costs.

14.     Plaintiff **Jeffrey W. Reichert** is a citizen and resident of the Commonwealth of **Virginia**.

15.     All Defendants, including Concordia Preparatory School and the individually named defendants, are citizens and residents of **Maryland**.

16.     The amount in controversy plainly **exceeds $75,000**, as Plaintiff seeks compensatory damages for emotional distress, interference with custodial rights, fraudulent concealment, mandatory reporter violations, negligence, physical and emotional harm to his minor son, loss of consortium and companionship, and related damages. Plaintiff also seeks punitive damages for Defendants' intentional, malicious, and oppressive conduct—punitive exposure alone surpasses the jurisdictional threshold.

17.     Because (a) the parties are citizens of different states, and (b) Plaintiff's claims exceed the statutory minimum, this Court has **original subject-matter jurisdiction** under § 1332(a), independent of the Court's federal-question jurisdiction or supplemental-jurisdiction authority.

### C. Venue

18.     Venue is proper in the District of Maryland under **28 U.S.C. § 1391(b)** because all Defendants reside in this District, and all substantial events, acts, and omissions giving rise to the claims occurred in Towson, Baltimore County, Maryland.

19.     Defendant Concordia Preparatory School conducts its operations within this District, employs the individual Defendants within this District, and the misconduct—including secret enrollment, misuse of an invalid TPO, concealment of records, physical interference with Plaintiff's communication with his son, and failure to report child abuse—occurred entirely within Maryland.

### D. The Parties

#### *1. Plaintiff*

20.     Plaintiff **Jeffrey W. Reichert** is an adult resident of Chesapeake, Virginia, and the biological father of minor child **Grant Reichert**. Plaintiff is a licensed attorney and has continually exercised lawful parental rights pursuant to a September 19, 2022 Maryland Custody

Order granting him full access to Grant's educational, medical, counseling, and administrative information.

21.    Plaintiff has suffered concrete and particularized injuries, including emotional distress, interference with custodial rights, reputational harm, loss of communication with his son, and fear for Grant's wellbeing. These injuries are directly traceable to Defendants' actions, and the relief sought will redress them.

### 2. Institutional Defendant: Concordia Preparatory School

22.    Defendant **Concordia Preparatory School ("CPS")** is a private school located at 1145 Concordia Drive, Towson, Maryland. CPS is responsible for its employees' conduct under **respondeat superior**, and for its independent acts of negligence, concealment, and statutory violations.

23.    CPS owed Plaintiff and Grant several duties, including:

- A duty to comply with the Custody Order;
- A duty to verify custodial authority during enrollment;
- A duty to provide educational information to both parents;
- A duty to refrain from interfering with parental rights;
- A duty to protect students from emotional and physical harm;
- A statutory **mandatory reporting duty** under Maryland Family Law § 5-704;
- A duty to maintain accurate student records;
- A duty of honesty and good faith when communicating with parents.

24.    CPS breached each of these duties deliberately and repeatedly.

### 3. Defendant Stephen Berger

9

25.     **Stephen Berger** is CPS's **Director of Admissions** and **Head Boys' Varsity Lacrosse Coach**, as listed on CPS's leadership webpage. He is sued in both his individual and official capacities.

26.     As Director of Admissions, Berger was responsible for processing, approving, and verifying Grant's enrollment and ensuring compliance with court-ordered custodial rights. As Head Lacrosse Coach, Berger exercised supervisory authority over Grant and maintained ongoing communication with him.

27.     Berger's dual roles placed him uniquely at the center of every major event described in this Complaint. Plaintiff alleges Berger acted intentionally, maliciously, and in coordination with Sarah Hornbeck to conceal Grant's enrollment, interfere with Plaintiff's custodial rights, enforce a legally invalid TPO, and isolate Grant from Plaintiff.

#### 4. Defendant Brent Johnson

28.     Defendant **Brent Johnson**, CPS Headmaster, is responsible for oversight of admissions and faculty. Johnson admitted to Plaintiff that he "had nothing to do with Grant's enrollment" and that Berger handled the process, thereby confirming Berger's central role and Johnson's knowledge of the misconduct.

#### 5. Defendant John Doe (Athletic Director)

29.     The Athletic Director supervised CPS athletic programs, including football and lacrosse, and helped implement Berger's directives restricting Plaintiff's access to Grant. The AD is also

in charge of the school's athletic website.  The AD is sued under a pseudonym pending discovery.

### 6. Defendants John Doe 1–2 (Football Coaches)

30.    These coaches physically restrained Grant on August 29, 2025, preventing him from approaching Plaintiff, and acted based on instructions from Berger and/or the Athletic Director. They are sued under pseudonyms pending identification. Plaintiff will amend this Complaint to substitute the true names of the John Doe Defendants promptly upon identification through discovery

### 7. Defendant Rev. Peter Couser

31.    **Rev. Peter Couser**, CPS campus pastor, participated in restricting Plaintiff's communications with Grant, including refusing supervised calls even when Grant requested them. Couser also exerted emotional pressure on Grant during a period of heightened distress.

### 8. Unidentified Staff and Agents

32.    Plaintiff reserves the right to amend this Complaint to add CPS employees or agents whose identities become known and who participated in, contributed to, or enabled the misconduct alleged herein.

## FACTUAL ALLEGATIONS

### A. Overview of the Scheme and Core Misconduct

33.     This case arises from a prolonged and coordinated course of conduct by Concordia

Preparatory School ("CPS") and several of its key administrators and coaches—including

Defendant Stephen Berger, the Director of Admissions and Head Varsity Lacrosse Coach—to

conceal Plaintiff's son Grant's enrollment, obstruct Plaintiff's lawful access to educational

information, interfere with a binding Custody Order, isolate Grant from his father, misuse an

invalid Temporary Protective Order ("TPO"), obstruct a state child-protective investigation, and

subject Grant to emotional and physical harm.

34.     Over a period of more than a year, CPS employees, acting individually and collectively,

engaged in a pattern of deceptive, unlawful, and harmful behavior that repeatedly violated

Plaintiff's federally protected parental rights, Maryland statutory duties, and well-established tort

law.

35.     The misconduct was not accidental, negligent, or isolated. Rather, Plaintiff alleges that

CPS—through Berger and others—acted deliberately and in close coordination with Grant's

mother, **Sarah Hornbeck**, in a manner that no reasonable school or educator could believe to be

lawful.

36.     Rather than fulfill its legal and ethical obligations to remain neutral and protect the best

interests of its student, CPS aligned itself with one parent, concealed information from the other,

and went so far as to enforce an unserved TPO that had no legal effect, even after its invalidity

was made clear.

37.     As detailed below, Berger is the central figure in this misconduct. As the individual

responsible for both (1) Grant's enrollment, and (2) Grant's participation in athletics, Berger's

role was unique: no other CPS employee possessed as much firsthand involvement, oversight, and operational authority over Grant's daily school life.

### B. Berger's Personal Relationship With Sarah Hornbeck and Resulting Conflict of Interest

38.     Plaintiff alleges that Berger and Grant's mother, **Sarah Hornbeck,** both attended Washington College and knew each other personally. Upon information and belief, they maintained communication and a positive relationship.

39.     Plaintiff alleges this connection created a significant conflict of interest that directly influenced Berger's decisions—including his willingness to conceal Grant's enrollment, to block Plaintiff's access, and to participate in a coordinated effort to keep Plaintiff uninformed and excluded.

40.     Because Berger was the **Director of Admissions,** he had unilateral authority to process and approve enrollment, meaning he could facilitate Sarah's objectives entirely on his own and without oversight.

41.     This conflict of interest was not hypothetical or passive. It manifested repeatedly in Berger's actions, communications, and decisions—each of which consistently favored Sarah's desired outcomes and harmed Plaintiff's custodial rights.

### C. Secret Enrollment of Grant at CPS and Berger's Exclusive Control Over the Process

42.     On or around July 2024, Defendant **Stephen Berger** personally enrolled Grant as a student at CPS. This fact is undisputed and was confirmed directly by the school's Headmaster, Defendant **Brent Johnson,** who told Plaintiff:

"I had nothing whatsoever to do with Grant's enrollment. Berger handled all of it."

43.     Despite being the highest-ranking administrator at the school, Johnson disclaimed all involvement in, and knowledge of, Grant's enrollment. This admission establishes:

44.     Berger alone controlled the enrollment process;

    13. No meaningful administrative oversight was applied;

    14. CPS's internal controls regarding custody verification were either nonexistent or intentionally circumvented.

45.     Berger enrolled Grant **without notifying Plaintiff**, without verifying custodial authority under the September 19, 2022, Custody Order, and without contacting Plaintiff to obtain mandatory educational consents.

46.     Under Maryland law and CPS policies, Berger had an affirmative duty to review custody orders and confirm parental authority before completing enrollment. He failed to do so.

47.     Subsequent emails from CPS reveal that the school already had the Custody Order "before school began," contradicting their initial claim that they did not receive it until October 9, 2024.

48.     This means Berger enrolled Grant **despite having actual or constructive knowledge** of Plaintiff's legal rights.

49.     Plaintiff did not learn his son was enrolled at CPS until roughly **seven weeks after the school year began**. During this time, he received:

18. No enrollment materials

19. No parent portal access

20. No communication from teachers or staff

21. No report cards or progress reports

22. No athletic information

23. No emergency contact forms

50.    Berger therefore effectuated a complete **concealment of Grant's presence** at CPS, leaving Plaintiff entirely unaware that his son was attending a private school he had no opportunity to approve, monitor, or participate in.

51.    This concealment deprived Plaintiff of:

20. His constitutional right to direct his child's education;

21. His statutory right to access records;

22. His right under the Custody Order to participate in decisions;

23. His right to ensure his son's safety and wellbeing;

24. His right to maintain a parental relationship with Grant.

52.    Under Maryland's heightened duty-of-care standards, educators must exercise "reasonable professional judgment" and must not interfere in custody disputes. Berger's conduct fell dramatically below any reasonable standard.

### D. Contradictory Statements, Institutional Dishonesty, and Conscious Concealment

53.     After Plaintiff discovered that Grant had been secretly enrolled at CPS, Plaintiff immediately began seeking explanations from school leadership regarding who authorized the enrollment, why Plaintiff was not notified, and why his custodial rights had been ignored.

54.     In response, CPS leadership and counsel provided **materially inconsistent and contradictory explanations**, none of which reconciled with the facts or with one another.

56.     Defendant **Brent Johnson**, CPS Headmaster, told Plaintiff directly that he had "nothing whatsoever to do with Grant's enrollment" and that **"Berger handled it."** Johnson's statement was unequivocal and unqualified.

57.     Johnson's admission established that:

(a) Berger personally controlled the enrollment process;

(b) Berger acted without meaningful oversight; and

(c) CPS leadership was aware—after the fact—that Berger had enrolled Grant independently.

58.     After Plaintiff pressed CPS regarding Berger's role, CPS's legal counsel sent a written communication stating that **"Mr. Berger has nothing to do with Grant's enrollment or education at CPS."**

59.     That representation was **false**, misleading, and knowingly so at the time it was made.

60.     Berger was, at all relevant times:

(a) CPS's **Director of Admissions**;

(b) The individual who enrolled Grant;

(c) Grant's **Head Varsity Lacrosse Coach;**

(d) The person sending weekly team emails referencing Grant's participation;

(e) The person who obtained and circulated the invalid TPO; and

(f) The person who directed athletic staff to restrict Plaintiff's access.

61.     CPS's statement that Berger "had nothing to do with Grant" cannot be reconciled with Berger's own conduct, communications, or job responsibilities.

62.     Plaintiff alleges that CPS, through its counsel, knowingly made this false statement in order to:

(a) Distance Berger from liability;

(b) Obscure the true decision-making chain;

(c) Prevent Plaintiff from confronting the responsible party; and

(d) Conceal the school's institutional failures.

63.     These contradictions were not isolated. CPS also changed its explanation regarding when it received the Custody Order.

64.     Initially, CPS represented that it did not receive the Custody Order until October 9, 2024. Later, CPS admitted that it had received the Order **"before school began."**

65.     This admission is critical. It establishes that CPS—and therefore Berger—had actual or constructive knowledge of Plaintiff's custodial rights at the time of enrollment.

66.     CPS has never explained how it could simultaneously possess the Custody Order, enroll Grant without Plaintiff's involvement, and then claim ignorance of Plaintiff's rights.

17

67.    The only reasonable inference is that CPS deliberately ignored the Custody Order and concealed that fact after Plaintiff began demanding answers.

68.    CPS also refused to produce enrollment records, admissions paperwork, internal emails, and communications with Sarah Hornbeck that would clarify who authorized the enrollment and under what authority.

69.    The refusal to produce records was not based on privacy concerns or legal restrictions. Rather, CPS selectively withheld records from Plaintiff while continuing to share information with Sarah.

70.    This selective disclosure demonstrates **bad faith, intentional concealment,** and **a conscious effort to maintain a false narrative** once Plaintiff began asserting his rights.

71.    CPS's shifting explanations, false statements, and refusal to provide basic records are powerful evidence that Defendants understood their conduct was improper and sought to hide it.

72.    Courts routinely recognize that **inconsistent explanations and concealment of records** support an inference of intent, malice, and consciousness of wrongdoing. Plaintiff alleges those inferences apply here.

### *E. Berger's Procurement, Circulation, and Enforcement of an Unserved and Legally Void Temporary Protective Order*

73.    Ironically, on the same day that Plaintiff contacted CPS for the first time, on **October 9, 2024**, Grant's mother, Sarah Hornbeck, filed a **Temporary Protective Order ("TPO")** against Plaintiff in Maryland state court[1].

74.    The TPO was **never served** on Plaintiff. As a matter of Maryland law, an unserved TPO has **no legal force or effect** and imposes no lawful restrictions on the respondent. It also contained a provision about "staying away from" CPS' campus, although Plaintiff had just become aware of the school's existence hours earlier and lives 5 hours away. Furthermore, Plaintiff did not contact Sarah Hornbeck when he discovered his son was attending CPS.  Upon information and belief, CPS personnel, including Defendant Berger, informed Sarah Hornbeck that Plaintiff had contacted the school.

75.    At all relevant times, Defendants either knew or should have known that an unserved TPO is legally void and unenforceable. This is basic legal knowledge readily ascertainable by any school administrator exercising minimal diligence.

                                                  .

76.    Despite this, Defendant **Stephen Berger** obtained a copy of the unserved TPO and affirmatively introduced it into CPS's athletic environment.

77.    Berger did not consult counsel to verify the legal status of the TPO, did not confirm service, did not request clarification from the issuing court, and did not notify Plaintiff of its existence.

---

[1] There is also a pending lawsuit (that was active at the time of filing) concerning Ms. Hornbeck's habit of filing illegal and false TPOs against Plaintiff. *See Reichert v. Hornbeck* 1:24-cv-01865, and an active case in Baltimore County Circuit Court *Jeffrey Reichert vs. Sarah Hornbeck, et al.*

78.     Instead, Berger treated the unserved TPO as if it were a binding court order and **used it as a pretext to isolate Grant from his father.**

79.     On the same day the TPO was filed, Berger **brought the document to football practice** and communicated its purported restrictions to CPS athletic staff.

80.     Acting at Berger's direction, CPS coaches removed Grant from practice and informed him that he "could not speak to [his] father anymore."

81.     This statement was false, unlawful, and devastating to a minor child who had committed no wrongdoing and whose father was subject to no lawful restriction.

82.     Plaintiff alleges that Berger knew the TPO had not been served and therefore knew it had no legal effect, but nevertheless chose to enforce it to advance Sarah Hornbeck's objectives and to further conceal Grant from Plaintiff.

83.     Even if Berger did not know the precise legal mechanics of service, his failure to verify service before enforcing the TPO constitutes **reckless disregard** for Plaintiff's rights and Grant's wellbeing.

84.     CPS later admitted in communications that staff acted on the TPO **"based on what Sarah said"**, rather than on any verified court order or legal instruction.

85.     This admission confirms that CPS delegated legal decision-making to one parent and abandoned any pretense of neutrality or lawful process.

86.     The misuse of the TPO was not an isolated event. After October 9, 2024, CPS continued

to cite the existence of the TPO as justification for blocking Plaintiff's access to Grant, refusing

supervised contact, and restricting communication—despite knowing the TPO was unserved and

invalid.

87.     Berger never corrected the record, never rescinded his instructions, and never took steps

to undo the harm he caused by introducing the invalid TPO into Grant's school environment.

88.     The emotional impact on Grant was immediate and severe. Being told by authority

figures that he could not speak to his father caused fear, confusion, and distress, and reinforced

the false narrative that Plaintiff was dangerous or prohibited.

89.     Berger's conduct weaponized a legally meaningless document to accomplish what he

could not lawfully do—cut off a father from his child.

90.     Courts have long recognized that the **knowing enforcement of a void legal instrument**

constitutes abuse of authority, supports punitive damages, and evidences malice.

91.     Berger's actions also exposed CPS to foreseeable harm, including emotional injury to

Grant, interference with parental rights, and liability for false imprisonment, emotional distress,

and civil conspiracy.

92.     At no point did Berger or CPS issue a written clarification, apology, or corrective

communication to Grant or Plaintiff acknowledging that the TPO was unenforceable.

93.     Instead, Defendants doubled down, concealed their actions, and continued to restrict

Plaintiff's access long after the absence of any legal restriction was apparent.

94.    Plaintiff alleges that the enforcement of the unserved TPO was a deliberate step in a broader scheme to isolate Grant from Plaintiff and to entrench CPS's earlier unlawful concealment of Grant's enrollment

### F. Physical Restraint of Grant by CPS Coaches Acting Under Berger's Authority

95.    On or about **August 29, 2025**, Plaintiff drove 5 hours from Virginia to Maryland to see Grant's away CPS football game. Following the game, two CPS football coaches—identified herein as **John Doe 1–2—physically restrained Grant** to prevent him from approaching Plaintiff.

96.    Neither Plaintiff or Grant had not engaged in any misconduct, posed no safety threat, and was not subject to any lawful restriction that would justify physical intervention.

97.    Plaintiff was present in a public area, had committed no wrongdoing, and was not subject to any protective order, court restriction, or school directive prohibiting contact.

98.    Nevertheless, CPS coaches **grabbed Grant and physically blocked his movement,** preventing him from walking toward his father.

99.    Immediately afterward, Grant told Plaintiff words to the effect of:

"You can't be here, you can get arrested.  It's dangerous for you"

100.    This statement confirms that the physical restraint was not incidental or accidental, but was undertaken **for the express purpose of enforcing CPS's unlawful prohibition on father–son communication**.

101.    Plaintiff alleges that the coaches acted pursuant to **prior directives and policies established by Defendant Stephen Berger and CPS athletic leadership,** including instructions that Plaintiff was not to be permitted to communicate with Grant.

102.    The restraint of Grant was **intentional, nonconsensual,** and **without lawful justification,** and constitutes false imprisonment under Maryland law.

103.    CPS has refused to identify the coaches involved, provide incident reports, or disclose any internal documentation relating to the restraint.

104.    No written disciplinary report, safety report, or justification has ever been produced explaining why physical force was used against a minor child to prevent parental contact.

105.    The physical restraint caused Grant immediate fear, humiliation, and emotional distress, and reinforced CPS's earlier unlawful narrative that his father was prohibited or dangerous.

106.    Plaintiff alleges that CPS knew or should have known that physically restraining a minor to prevent parental contact—absent an emergency or lawful order—was unlawful and posed a foreseeable risk of psychological harm.

107.    The restraint also escalated CPS's misconduct from administrative interference into **physical coercion,** further demonstrating reckless disregard for Grant's wellbeing.

108.    At no point did CPS notify Plaintiff of any supposed safety concern, disciplinary issue, or emergency that would justify physical intervention.

109.    CPS's failure to investigate, document, or remediate the restraint demonstrates institutional ratification of the conduct.

110.    The restraint incident was consistent with CPS's broader pattern of enforcing unlawful restrictions on Plaintiff through intimidation, concealment, and misuse of authority.

111.    Plaintiff alleges that CPS's conduct in physically restraining Grant was a foreseeable and direct consequence of Berger's earlier directives and CPS's institutional adoption of those directives.

### G. CPS's Refusal to Permit Father–Son Communication, Even When Grant Requested It

112.    Following the October 9, 2024 enforcement of the invalid TPO, CPS adopted a blanket policy of refusing to permit **any communication** between Plaintiff and his son, Grant, regardless of circumstance, legality, or the child's expressed wishes.

113.    Plaintiff repeatedly requested reasonable, lawful forms of communication, including brief supervised phone calls, in-school check-ins, and monitored contact through CPS personnel.

114.    These requests were not only lawful but were explicitly contemplated by the September 19, 2022, Custody Order, which grants Plaintiff access to educational environments and personnel and does not restrict communication absent a valid court order.

115.    CPS refused every such request.

116.    On multiple occasions, **Grant himself requested to speak with Plaintiff** while at school.

117.    In one such instance, Grant asked to call Plaintiff from the office of Defendant **Rev. Peter Couser**, the CPS campus pastor and an individual responsible for student emotional support.  He was scared to call Plaintiff from home, so he wanted to use the pastor's office as a "safe place".

118.    Despite Grant's request and despite the availability of supervision, CPS denied the call.

119.    CPS provided no legal justification, no written explanation, and no contemporaneous documentation for its refusal.

120.    CPS's refusal to allow communication was not based on safety, discipline, or educational necessity, but rather on the same unlawful narrative initially advanced by Berger—namely, that Plaintiff was not permitted to communicate with his own child.

121.    Plaintiff's mother, a court-authorized communication supervisor and a career educator, also requested that CPS allow a monitored call between Plaintiff and Grant.

122.    CPS refused this request as well.

123.    These refusals demonstrate that CPS was not acting cautiously or neutrally but had instead adopted an **institutional position of total exclusion**, severing communication between father and son without legal authority.

124.    CPS's actions directly contradicted its purported mission to act in the best interests of students and to support their emotional wellbeing.

125.    Grant's requests to speak with his father were expressions of distress and need for reassurance. CPS's refusal exacerbated that distress.

126.    Plaintiff alleges that CPS's refusal to permit communication—particularly when Grant himself asked for it—constituted **intentional infliction of emotional harm** and demonstrated **reckless disregard** for Grant's psychological wellbeing.

127.    By denying even supervised communication, CPS foreclosed the least restrictive alternatives available and instead chose the most extreme option: complete isolation.

128.    CPS staff did not document Grant's requests, did not escalate them for review, and did not consult legal counsel before denying contact.

129.    CPS never reassessed its position even after it became clear that no valid protective order restricted Plaintiff's communication.

130.    This prolonged refusal to allow father–son communication continued for months and remains ongoing, creating irreparable harm to Plaintiff's parental relationship and to Grant's emotional health.

131.    Plaintiff alleges that CPS's refusal to permit communication was part of a deliberate strategy to entrench the unlawful status quo created by Berger's initial concealment and misuse of authority.

132.    CPS's conduct in this regard further supports Plaintiff's claims for tortious interference with custodial rights, intentional infliction of emotional distress, civil conspiracy, and the need for immediate injunctive relief.

### H. CPS's Failure to Report Suspected Abuse and Violation of Mandatory Reporter Obligations

133.    Maryland law imposes **mandatory reporting obligations** on educators, school administrators, counselors, and other school personnel who have reason to believe that a child has been subjected to abuse or neglect. See **Md. Code Ann., Fam. Law § 5-704**.

134.    As a private school educating minors, CPS and its employees—including administrators, coaches, and pastoral staff—are **mandatory reporters** under Maryland law and are required to report suspected abuse or neglect immediately upon having reason to believe it has occurred.

135.    Beginning no later than October 2024, CPS personnel were repeatedly placed on notice that Grant was experiencing **emotional and psychological distress**, fear, and confusion arising from his isolation from Plaintiff and from his mother's conduct.

136.    Plaintiff directly informed CPS administrators and staff that Grant was being emotionally manipulated, isolated from his father, and subjected to distressing narratives that Plaintiff was prohibited or dangerous.

137.    Grant himself expressed distress to CPS staff and requested contact with Plaintiff, demonstrating a need for parental reassurance and support.

138.    Despite these red flags, CPS did not initiate a report to Child Protective Services ("CPS/DSS"), did not consult with child-protection authorities, and did not document any internal assessment of Grant's safety or emotional wellbeing.

27

139.     Plaintiff's mother, a career educator and **mandatory reporter**, personally spoke with Grant and, based on his statements and emotional condition, filed a report with CPS/DSS.

140.     That report triggered a formal state investigation.

141.     At that point, CPS was indisputably on notice that concerns about Grant's safety and emotional wellbeing were sufficiently serious to warrant government intervention.

142.     Even then, CPS **failed to file its own mandatory report**, failed to supplement the investigation with information in its possession, and failed to provide candid cooperation with investigators.

143.     CPS's failure to report was not the result of ignorance or oversight. CPS administrators are trained professionals who understand mandatory reporting obligations and the gravity of failing to comply.

144.     Instead, Plaintiff alleges that CPS deliberately chose not to report suspected abuse because doing so would have exposed its prior misconduct, including the concealment of Grant's enrollment, misuse of the invalid TPO, and interference with Plaintiff's parental rights.

145.     CPS also failed to implement any protective or remedial measures for Grant during the pendency of the investigation, despite knowing that he was distressed and isolated.

146.     CPS's inaction violated Maryland law and breached its independent statutory duty to protect children entrusted to its care.

147.     Courts recognize that failure to comply with mandatory reporting statutes constitutes evidence of negligence, recklessness, and bad faith, particularly where the failure exposes a child to ongoing harm.

148.     CPS's violation of its mandatory reporter obligations directly contributed to the continuation of Grant's emotional distress and deprived him of timely protective intervention.

149.    Plaintiff alleges that CPS's failure to report suspected abuse was part of a broader pattern of concealment and institutional self-protection, rather than an isolated lapse in judgment.

150.    CPS's statutory violations further support Plaintiff's claims for negligence, negligent supervision, intentional infliction of emotional distress, civil conspiracy, punitive damages, and emergency injunctive relief.

### I. CPS's Obstruction of the CPS/DSS Investigation

151.    After Plaintiff's mother filed a report with Child Protective Services ("CPS/DSS") based on direct statements from Grant and concerns regarding his emotional wellbeing, CPS was formally placed on notice that a state child-protective investigation was underway.

152.    From that point forward, CPS had an affirmative duty to cooperate fully, truthfully, and transparently with investigators and to provide all information relevant to Grant's safety and wellbeing.

153.    CPS failed to do so.

154.    Rather than cooperate, CPS engaged in a pattern of **delay, minimization, and selective disclosure** designed to shield the institution and its personnel from scrutiny.

155.    CPS did not proactively disclose its role in secretly enrolling Grant, did not disclose the concealment of records from Plaintiff, and did not disclose its enforcement of an unserved and legally void Temporary Protective Order.

156.    CPS also failed to disclose the physical restraint of Grant by its coaches, an incident that bore directly on Grant's safety and emotional wellbeing.

157.    Upon information and belief, CPS did not provide investigators with internal emails, admissions records, athletic directives, or communications involving Stephen Berger, despite their clear relevance to the investigation.

158.    CPS likewise failed to disclose that Grant had been repeatedly denied communication with Plaintiff, even when Grant himself requested contact.

159.    CPS's obstruction was not passive. CPS administrators and counsel responded to inquiries in a manner calculated to minimize CPS's involvement, deflect responsibility, and portray the situation as a private family dispute rather than an institutional failure.

160.    CPS's posture toward the investigation mirrored its earlier conduct toward Plaintiff: selective disclosure, shifting explanations, and refusal to produce documentation that would reveal the truth.

161.    CPS never produced a written internal assessment of Grant's safety, never documented any protective measures taPeter on his behalf, and never implemented corrective actions during the pendency of the investigation.

162.    CPS did not discipline any employee for the misconduct described herein, did not revise its policies, and did not notify Plaintiff of any remedial steps.

163.    CPS's failure to cooperate deprived investigators of critical information necessary to assess Grant's situation accurately and delayed potential protective intervention.

164.    Plaintiff alleges that CPS's obstruction was motivated by a desire to avoid exposure of its earlier violations of law, including its failure to verify custodial authority, misuse of the TPO, and violation of mandatory reporter obligations.

165.    Courts recognize that obstruction of child-protective investigations constitutes evidence of bad faith, recklessness, and conscious disregard for child safety.

166.    CPS's obstruction of the CPS/DSS investigation further supports Plaintiff's claims for negligence, negligent supervision, civil conspiracy, fraudulent concealment, and punitive damages.

167.    CPS's conduct also underscores the need for **court-ordered injunctive relief,** as the institution has demonstrated that it cannot be trusted to police itself or to prioritize child welfare over institutional self-interest.

### *J. Pattern, Practice, and Institutional Ratification of Unlawful Conduct*

168.    The misconduct described in this Complaint was not the result of a single error, misunderstanding, or rogue employee. Rather, it reflects a **pattern and practice of unlawful conduct** by CPS that was knowingly tolerated, adopted, and ratified by the institution.

169.    From the moment Grant was secretly enrolled, CPS repeatedly chose concealment over transparency, exclusion over neutrality, and institutional self-protection over child welfare.

170.    CPS leadership, including Defendant Brent Johnson, became aware of the unlawful enrollment, the misuse of the invalid TPO, and the restrictions placed on Plaintiff's communication with Grant. Despite this knowledge, CPS took **no corrective action.**

171.    CPS did not reverse the enrollment decision, did not notify Plaintiff retroactively, did not restore access to records, and did not discipline Berger or any athletic staff.

172.    Instead, CPS continued to enforce the same unlawful restrictions month after month, even after their legal invalidity was apparent.

173.    CPS's counsel compounded this misconduct by making false or misleading statements denying Berger's involvement, thereby institutionalizing the concealment rather than correcting it.

174.    CPS's refusal to allow even supervised contact between Plaintiff and Grant—despite the absence of any valid court order—was not the act of an individual employee, but an **institutional policy** implemented across administrative, athletic, and pastoral staff.

175.    CPS's failure to report suspected abuse, failure to cooperate with CPS/DSS investigators, and refusal to disclose records were likewise **systemic decisions**, not isolated lapses.

176.    The physical restraint of Grant by CPS coaches further demonstrates that CPS's unlawful policies were understood, internalized, and enforced by multiple employees across departments.

177.    CPS's failure to investigate the restraint incident, document it, or take remedial action constitutes **ratification** of that conduct under Maryland law.

178.    CPS's actions reflect a broader pattern of intervening improperly in custody matters, favoring one parent over the other, and substituting its own judgment for that of the courts.

179.    CPS never advised Plaintiff that it would remain neutral, never sought court guidance, and never took steps to unwind its earlier misconduct.

180.    Instead, CPS doubled down, continued to restrict access, and resisted every attempt by Plaintiff to restore lawful communication.

181.    The repetition, consistency, and duration of CPS's actions demonstrate a deliberate institutional choice rather than inadvertence.

182.    Courts recognize that when an institution knowingly permits unlawful conduct to continue, fails to discipline wrongdoers, and benefits from concealment, it is liable not only for the underlying acts but also for **punitive damages** and **equitable relief**.

183.    CPS's pattern and practice of unlawful conduct establish that injunctive relief is necessary to prevent future violations and to ensure compliance with custody orders and child-protection laws.

184.    Plaintiff alleges that absent court intervention, CPS will continue to engage in similar misconduct, both toward Grant and toward other students and families.

### *L. Resulting Harm, Prolonged Separation, and Irreparable Injury*

185.    Defendants acted with full knowledge that Plaintiff had already been separated from his son for an extended period as a result of ongoing court proceedings and related disputes.

186.    Plaintiff has not had meaningful in-person contact with Grant since **February 2, 2022,** when Grant was removed from Plaintiff's care pursuant to court proceedings.

187.    Since **October 2023**, Plaintiff has spoken to Grant only once, in **January 2025**, and has otherwise been entirely deprived of communication with his son.

188.    Defendants knew or should have known that Plaintiff's relationship with Grant was already fragile and strained by prolonged separation, and that any additional interference would cause extraordinary emotional harm.

189.    Rather than act cautiously or neutrally, Defendants' actions **exacerbated and prolonged** Plaintiff's separation from his son by:

    22. Concealing Grant's enrollment;

    23. Enforcing a legally void TPO;

    24. Blocking all communication;

    25. Physically restraining Grant to prevent contact;

    26. Refusing supervised alternatives;

    27. Ignoring Grant's own requests to speak with his father.

190.    Defendants' conduct did not merely coincide with Plaintiff's separation from Grant—it **intensified it,** reinforced it, and made reunification more difficult.

191.    Defendants knew that their actions would be used, cited, or relied upon in other contexts to justify continued separation, and nevertheless proceeded with reckless disregard for the foreseeable consequences.

192.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered severe emotional distress, loss of companionship, humiliation, and ongoing fear for his son's emotional wellbeing.

193.    Grant has likewise suffered emotional harm, confusion, fear, and distress from being told that his father was prohibited, dangerous, or unavailable—messages delivered by authority figures he was taught to trust.

194.    The harm inflicted by Defendants is **ongoing**. Each day that CPS maintains its unlawful restrictions and continues to legitimize false narratives about Plaintiff deepens the injury.

195.    Monetary damages alone cannot remedy the loss of time, trust, and relationship between a father and his child.

196.    Defendants' conduct therefore constitutes **irreparable harm,** warranting immediate injunctive relief to prevent further interference and to remove CPS from any role in perpetuating Plaintiff's separation from his son.

197.    Plaintiff seeks injunctive relief not to relitigate custody, but to stop Defendants from continuing to act as an unlawful barrier to lawful parental contact and reunification.

## PART IV — CAUSES OF ACTION

## COUNT I

### *Tortious Interference with Custodial and Parental Rights*

### *(Against All Defendants)*

198.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein.

35

199.    Under Maryland law, a parent has a legally protected interest in the care, custody, companionship, and control of his child, including the right to participate in educational decisions and to maintain communication absent a valid court order restricting such rights.

200.    At all relevant times, Plaintiff possessed lawful custodial and parental rights under a valid Maryland Custody Order dated September 19, 2022.

201.    Defendants had actual knowledge of Plaintiff's custodial rights, including actual or constructive knowledge of the Custody Order prior to and during Grant's enrollment at CPS.

202.    Despite this knowledge, Defendants intentionally interfered with Plaintiff's custodial and parental rights by, among other things:

    a. Secretly enrolling Grant without notifying Plaintiff;

    b. Concealing Grant's enrollment and educational records;

    c. Enforcing an unserved and legally void Temporary Protective Order;

    d. Blocking all communication between Plaintiff and Grant;

    e. Physically restraining Grant to prevent contact; and

    f. Refusing supervised or reasonable alternatives.

203.    Defendants' conduct was intentional, willful, and without legal justification.

204.    Defendants knew or should have known that their actions would substantially interfere with Plaintiff's parental relationship and exacerbate an already-existing separation.

205.    As a direct and proximate result of Defendants' interference, Plaintiff suffered emotional distress, loss of companionship, humiliation, and irreparable harm to the parent–child relationship.

206.    Defendants' conduct was undertaken with malice or reckless disregard for Plaintiff's rights, entitling Plaintiff to compensatory and punitive damages.

**COUNT II**

**Negligence**

*(Against All Defendants)*

207.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein.

208.    Defendants owed Plaintiff and Grant a duty of reasonable care, including duties to:

a. Verify custodial authority during enrollment;

b. Comply with court orders;

c. Avoid interfering with parental rights;

d. Protect Grant from emotional and physical harm;

e. Act in accordance with Maryland law and professional standards.

209.    Defendants breached these duties by engaging in the conduct described in Part III, including concealment, misinformation, misuse of an invalid TPO, physical restraint, and refusal to permit communication.

210.    Defendants knew or should have known that their conduct created an unreasonable risk of harm to Grant and Plaintiff.

37

211.    Defendants' breaches were the direct and proximate cause of Plaintiff's injuries and Grant's emotional harm.

212.    Plaintiff suffered damages including emotional distress, loss of companionship, and related harms.

## COUNT III

### Negligent Supervision

*(Against Concordia Preparatory School)*

213.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein.

214.    CPS owed a duty to supervise its employees, including Berger, the Athletic Director, coaches, and pastoral staff, to ensure compliance with law and protection of students and parents.

215.    CPS failed to supervise its employees adequately, allowing them to:

   a. Enroll Grant without verifying custodial authority;

   b. Enforce an invalid TPO;

   c. Physically restrain Grant;

   d. Deny communication unlawfully;

   e. Obstruct a CPS/DSS investigation.

216.    CPS knew or should have known of its employees' misconduct and failed to intervene, discipline, or correct it.

217.    CPS's failure to supervise was a proximate cause of Plaintiff's injuries and Grant's harm.

## COUNT IV

### Negligent Hiring and Retention

*(Against Concordia Preparatory School)*

218.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein.

219.    CPS had a duty to hire and retain employees fit to work with minors and capable of complying with custody orders and mandatory reporting laws.

220.    CPS breached this duty by hiring and retaining employees who were unfit, improperly trained, or permitted to exercise authority in violation of law.

221.    CPS retained employees after becoming aware of their misconduct, thereby ratifying their actions.

222.    CPS's negligent hiring and retention directly caused Plaintiff's and Grant's injuries.

### COUNT V

### Violation of Mandatory Reporter Obligations (Negligence Per Se)

*(Against Concordia Preparatory School and Individual Mandatory Reporters)*

223.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein.

224.    Maryland Family Law § 5-704 imposes mandatory reporting obligations on educators and school personnel.

225.    Defendants had reason to believe Grant was experiencing emotional abuse and distress.

226.    Defendants failed to report suspected abuse as required by law.

227.    Defendants' statutory violations constitute negligence per se.

228.    As a direct result, Grant's harm was prolonged and unaddressed.

## COUNT VI

### Intentional Infliction of Emotional Distress

*(Against All Defendants)*

229.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein.

230.    Defendants engaged in extreme and outrageous conduct by isolating a child from his father, misrepresenting Plaintiff's legal status, physically restraining Grant, and ignoring Grant's requests for contact.

231.    Defendants acted intentionally or with reckless disregard for the likelihood of causing severe emotional distress.

232.    Plaintiff and Grant suffered severe emotional distress as a result.

## COUNT VII

### False Imprisonment

*(On Behalf of Grant; Against CPS and John Doe Coaches)*

233.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein. Plaintiff brings this claim as Grant's parent and next friend.

234.    CPS coaches intentionally restrained Grant without lawful authority.

235.    Grant was confined against his will.

236.    The restraint was unlawful and caused harm.

## COUNT VIII

### Fraudulent Concealment

#### (Against All Defendants)

237.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein.

238.    Defendants concealed material facts, including Grant's enrollment, Berger's role, the status of the TPO, and CPS's actions.

239.    Defendants knew the concealed facts were material.

240.    Defendants intended Plaintiff to rely on the concealment.

241.    Plaintiff relied on Defendants' concealment to his detriment.

## COUNT IX

### Civil Conspiracy

#### (Against All Defendants)

242.    Plaintiff incorporates by reference Paragraphs 1 through 184 as if fully set forth herein.

243.    Defendants reached a tacit agreement to interfere with Plaintiff's rights.

244.    Defendants committed overt acts in furtherance of the agreement.

245.    Plaintiff was injured as a result.

## COUNT X

### Respondeat Superior

#### *(Against Concordia Preparatory School)*

246.    CPS is vicariously liable for the acts of its employees committed within the scope of employment.

## COUNT XI

### Punitive Damages

#### *(Against All Defendants)*

247.    Defendants acted with actual malice, ill will, and reckless disregard for Plaintiff's rights.

248.    Punitive damages are warranted, particularly as to Counts VI, VIII, and IX, to punish and deter similar misconduct.

## PART V — REQUEST FOR EMERGENCY INJUNCTIVE RELIEF

249.    Plaintiff incorporates by reference Paragraphs 1 through 264 as if fully set forth herein.

250.    Plaintiff seeks **temporary, preliminary, and permanent injunctive relief** pursuant to **Federal Rule of Civil Procedure 65**, this Court's inherent equitable authority, and applicable Maryland law.

251.    Plaintiff does **not** seek to relitigate custody, modify any custody order, or interfere with state-court jurisdiction. Rather, Plaintiff seeks narrowly tailored relief to prevent Defendants from continuing to unlawfully interfere with Plaintiff's parental rights and to stop ongoing and irreparable harm caused by Defendants' conduct.

## A. Irreparable Harm

252.    Plaintiff has suffered, and continues to suffer, **irreparable harm** as a direct result of Defendants' actions.

253.    Plaintiff has been deprived of communication with his son, access to educational records, and participation in his son's schooling for an extended period of time.

254.    Courts consistently recognize that **loss of parental access, loss of time with one's child, and damage to the parent–child relationship** constitute irreparable harm for which monetary damages are inadequate.

255.    Grant has likewise suffered irreparable harm, including emotional distress, confusion, fear, and psychological injury from being isolated from his father, misinformed about Plaintiff's legal status, and physically restrained to prevent contact.

256.    Each additional day that Defendants maintain their unlawful restrictions compounds the harm to both Plaintiff and Grant.

257.    The harm is ongoing, immediate, and not speculative.

## B. Likelihood of Success on the Merits

258.    Plaintiff has a strong likelihood of success on the merits of his claims.

259.    Plaintiff possessed lawful custodial and parental rights under a valid Custody Order.

260.    Defendants knowingly interfered with those rights by concealing enrollment, enforcing a legally void Temporary Protective Order, blocking communication, physically restraining Grant, and withholding records.

261.    Defendants lacked any lawful authority to engage in this conduct.

262.    Defendants' actions violated Maryland tort law, statutory duties, and well-established principles governing parental rights and school neutrality in custody matters.

263.    Defendants' inconsistent explanations, concealment of records, and refusal to correct known errors further demonstrate bad faith and liability.

### C. Balance of Equities

264.    The balance of equities weighs overwhelmingly in Plaintiff's favor.

265.    Plaintiff seeks only to restore lawful access, stop unlawful interference, and prevent further harm.

266.    Defendants will suffer no legitimate hardship from being required to comply with the law, honor custody orders, and cease unlawful conduct.

267.    By contrast, denying injunctive relief would permit Defendants to continue causing harm that cannot be undone.

### D. Public Interest

268.    The public interest strongly favors granting injunctive relief.

269.    The public has a compelling interest in ensuring that schools comply with custody orders, do not interfere in family-law matters, and do not misuse legal instruments to isolate children from parents.

270.    The public also has a strong interest in enforcing mandatory reporter laws, protecting children from emotional harm, and ensuring transparency and accountability in educational institutions.

271.    Granting injunctive relief will deter similar misconduct by other schools and protect the integrity of educational institutions.

### E. Requested Injunctive Relief

272.    Plaintiff respectfully requests that the Court issue immediate injunctive relief, including but not limited to an order:

>    **a.** Enjoining Defendants from interfering, directly or indirectly, with Plaintiff's lawful communication with Grant absent a valid court order;

>    **b.** Enjoining Defendants from enforcing or relying upon any unserved, expired, or invalid protective order;

>    **c.** Requiring Defendants to permit reasonable, supervised communication between Plaintiff and Grant while Grant remains enrolled at CPS;

**d.** Requiring Defendants to provide Plaintiff immediate access to all educational, athletic, counseling, disciplinary, and administrative records relating to Grant;

**e.** Prohibiting Defendants from physically restraining Grant for the purpose of preventing parental contact;

**f.** Requiring Defendants to preserve all documents, emails, messages, and records relating to Plaintiff, Grant, enrollment decisions, protective orders, and communications with third parties;

**g.** Prohibiting Defendants from retaliating against Plaintiff or Grant for seeking judicial relief;

**h.** Granting such other and further injunctive relief as the Court deems just and proper.

### F. Necessity of Immediate Relief

273.   Defendants' past conduct demonstrates that they will continue to interfere with Plaintiff's rights absent court intervention.

274.   Plaintiff therefore seeks expedited consideration and emergency relief to prevent further irreparable harm.

### PART VI — PRAYER FOR RELIEF

WHEREFORE, Plaintiff **Jeffrey W. Reichert** respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

### A. Declaratory Relief

46

275.    A declaration that Defendants' actions and omissions, as alleged herein, violated Plaintiff's lawful custodial and parental rights and were unlawful under Maryland law;

276.    A declaration that Defendants had no lawful authority to enforce or rely upon an unserved, expired, or otherwise invalid Temporary Protective Order to restrict Plaintiff's access to his son;

277.    A declaration that Defendants' concealment of Grant's enrollment and denial of access to records violated their legal duties owed to Plaintiff and Grant.

## B. Injunctive and Equitable Relief

278.    Temporary, preliminary, and permanent injunctive relief enjoining Defendants from interfering, directly or indirectly, with Plaintiff's lawful communication with Grant absent a valid court order;

279.    An order prohibiting Defendants from enforcing, referencing, or relying upon any unserved, expired, or invalid protective order or similar document;

280.    An order requiring Defendants to provide Plaintiff immediate and complete access to all educational, athletic, counseling, disciplinary, medical (to the extent held by CPS), and administrative records relating to Grant;

281.    An order requiring Defendants to permit reasonable, supervised communication between Plaintiff and Grant while Grant remains enrolled at CPS;

282.    An order prohibiting Defendants from physically restraining Grant or otherwise using physical force to prevent parental contact absent an immediate safety emergency;

283.    An order requiring Defendants to preserve all documents, emails, text messages, internal communications, admissions records, athletic directives, and communications with third parties relating to Plaintiff, Grant, enrollment decisions, protective orders, and CPS/DSS investigations;

284.    An order prohibiting retaliation against Plaintiff or Grant for seeking judicial relief or participating in this action;

285.    Such other equitable relief as the Court deems just and proper to prevent further harm.

### C. Compensatory Damages

286.    Compensatory damages in an amount to be determined at trial for emotional distress, loss of companionship, humiliation, reputational harm, and related injuries suffered by Plaintiff;

287.    Compensatory damages for emotional distress and psychological harm suffered by Grant as a direct and proximate result of Defendants' conduct;

### D. Punitive Damages

288.    Punitive damages against Defendants in an amount sufficient to punish and deter Defendants and similarly situated institutions from engaging in similar misconduct, based on Defendants' willful, malicious, and reckless disregard for Plaintiff's rights and Grant's wellbeing;

### E. Costs, Fees, and Interest

289.    An award of costs of suit, including filing fees and taxable costs;

290.    Pre- and post-judgment interest as permitted by law;

### F. Other Relief

291.    Such other and further legal or equitable relief as this Court deems just and proper.

### PART VII — JURY DEMAND

292.    Plaintiff hereby **demands a trial by jury** on all issues so triable pursuant to **Federal Rule of Civil Procedure 38**.

### PART VIII — NO DOMESTIC RELATIONS EXCEPTION APPLIES

293.    This action does **not** seek a determination of custody, visitation, parental status, or modification of any family court order.

294.    Plaintiff does not ask this Court to assume jurisdiction over domestic relations matters traditionally reserved to state courts.

295.    Rather, this action seeks relief against a **private educational institution and its employees** for independent tortious conduct, statutory violations, and unlawful interference with parental rights.

296.    The claims asserted herein arise from Defendants' own actions—including concealment, misrepresentation, misuse of a legally void document, physical restraint of a minor, obstruction of a child-protective investigation, and violation of mandatory reporting obligations—and are **wholly independent of any custody determination.**

297.    Resolution of Plaintiff's claims does not require this Court to interpret, modify, or enforce any custody order, but only to determine whether Defendants complied with the law governing schools, mandatory reporters, and third-party interference with parental rights.

298.    Accordingly, the **domestic relations exception does not apply**, and this Court has subject-matter jurisdiction over Plaintiff's claims.

Respectfully submitted,

/s/ Jeffrey W. Reichert

Jeffrey W. Reichert

3812 Bruce Road

Chesapeake, VA 23321

Telephone: (410) 905-2624

Email: jeff@reliancelegalllc.com

Plaintiff, Pro Se